UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASHLEIGH SMITH, | No. 2:18-CV-2877 DJC AC |
| Petitioner, | |
| v. | FINDINGS AND RECOMMENDATIONS |
| J. ESPINOZA, Warden, | |
| Respondent. | |

Petitioner is a California state prisoner proceeding pro se with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The action proceeds on the First Amended Petition, ECF No. 6, which challenges petitioner's 2016 conviction for assault causing the death of a child. Respondent has answered. ECF No. 12. Petitioner did not file a traverse, and the time for doing so has long since expired.

BACKGROUND

I. Proceedings in the Trial Court

Petitioner Ashleigh Smith and her partner Terry Scott were charged in Sacramento County with murder and child abuse in relation to the death of their three-month-old son, Tyrese. They were tried together.

////

////

1

    A. <u>The Evidence Presented at Trial</u>

        1. <u>Prosecution Case</u>

The jury heard evidence of the following facts, which are recited here in detail because petitioner challenges the sufficiency of the evidence.[1]

Petitioner and Terry Scott called 911 in the early hours of a July morning in 2014. Petitioner reported that her three-month-old son (born three weeks premature in April 2014) was nonresponsive after regurgitating milk, which they had attempted to extract from his airways with a suction device. Petitioner said they would meet the responders at the gate to the complex because they did not know the number of the apartment where they were staying. By the end of the 911 call, defendants were outside hailing the fire truck.

The firefighters quickly determined that the paramedics needed to be prepared to treat a limp infant who was not breathing at all and did not have a pulse. Their preliminary examination of the infant was hampered because he was tightly swaddled in two layers of blankets, which struck them as an odd step to take with an infant who was not breathing. They noticed circumferential scratches around the infant's neck, which appeared to be symmetrical rather than random (which would be atypical of self-inflicted scratches).

The circumstances of the encounter left the firefighters feeling uneasy. The captain testified that he participated in 50 to 100 calls per year involving children, and he had never seen parents behave as detached and apathetic as defendants. Scott would not even look one of the paramedics in the eye or respond when questioned. The captain was concerned enough about keeping track of the parents that he asked petitioner to ride in the cab of the emergency vehicle to the hospital, which was contrary to his usual protocol.

Beginning at the scene, petitioner gave multiple accounts of what had happened before the 911 call, which were at odds with each other and with accounts that Scott provided.

At the emergency room, petitioner reported for the first time that she and Scott had

---

[1] This statement of facts is adapted from the opinion of the California Court of Appeal, Lodged Doc. 10 (ECF No. 13-10) at 2-8. The undersigned has independently confirmed the accuracy of this summary of the evidence.

performed CPR on the baby, which had not been mentioned to the responding paramedics. A nurse practitioner in the emergency room could not think of any reason why anyone would stop performing CPR and instead swaddle a baby on a warm July morning. When petitioner claimed that milk had started regurgitating while she was feeding the baby, the nurse did not understand why the feeding process was not simply paused. When petitioner then alternately claimed that the baby began to regurgitate more than 20 minutes after being fed, the nurse found this simply bizarre and outside anything in her medical experience. It was also odd that petitioner asked whether performing CPR could have caused the regurgitation and choking, when obviously the CPR was supposedly a response to the situation. The nurse practitioner had never seen a mother appear as apathetic as petitioner.

When Scott arrived at the hospital, he also appeared apathetic. There did not seem to be any rapport between the couple, or effort to console one another. Instead, Scott glared at petitioner. His demeanor did not improve until a doctor told him they were not suspected of child abuse, at which point he jumped up and expressed his relief, and then went outside to smoke. When the parents were allowed to visit the intubated baby, Scott was not seen in the room and petitioner did not attempt to touch her child.

Tyrese was transferred from the Kaiser Permanente emergency department to the pediatric intensive care unit at U.C. Davis Medical Center that afternoon. An EEG showed no brain activity. His chance of survival was estimated as near zero.

A medical social worker went to speak to the couple, after doctors shared with her their suspicions that the baby was the victim of nonaccidental trauma. She found petitioner calmly using a computer for families in the waiting room, which is in contrast with the behavior of most families under these circumstances. In a later interview, petitioner told the social worker that only she and Scott provided care for the baby. Scott was present for part of the interview, looking sullen and reacting angrily to a doctor who was present to explain the extent of the baby's injuries and the small odds of his survival; the social worker had never seen such a reaction in 28 years of experience. At this point, petitioner was beginning to appear upset. Hearing the parents again claim that they had been suctioning the baby and performing CPR for 30 minutes before calling

911, it struck the social worker that this was a long time to delay in summoning medical aid.

None of Smith and Scott's various explanations accounted for the medical condition of their infant. There was discoloration on the back of his head from some impact in the last month, with hemorrhaging underneath. There was evidence of chronic injury to the right side of the brain from a lack of blood supply (which could be the result of a compressed artery), and it had shrunk in size compared with the other hemisphere. The left side of the brain also had a hematoma from an acute injury. There were scars and abrasions on both sides of his neck. He had a total of 10 rib fractures in different stages of healing. A testicle and an eye were hemorrhaging. The degree of injury to the right side of the brain would have caused difficulties with movement that should have been apparent to any reasonable caregiver. Overall, the pathologist attributed the cause of death to blunt force trauma within a day or two before the baby was declared brain dead. A consulting physician believed that dead tissue in the brain was the result of choking the right carotid artery. The injuries bringing about the baby's death had to have occurred within two to three days before the brain death. The scratches around the neck were simply an injury that could not be necessarily connected with any choking.

In subsequent separate police interviews later that day at the hospital, Scott was crying. Petitioner appeared nonchalant and did not inquire after the condition of her child. That evening, the police conducted separate interviews of the parents at the station. As Scott was awaiting transport, he sat in the police car rapping to himself; petitioner was devoid of affect as she sat in the patrol car. The detective interviewing petitioner testified that she appeared to be acting as if she were in tears, but was not actually crying. She accounted for the scratches on the infant's neck as the inadvertent product of her long artificial nails while bathing him a couple of weeks earlier. She had never seen anyone abuse the infant. Scott's demeanor through his interview was unlike anything the detective had ever encountered. He was apathetic, when he was not being mocking or aggressive. Both parents said that they had exclusive care of the baby for his short life, and petitioner said that the couple were continuously in each other's company except while she was busy with online courses. Scott eventually admitted that earlier in the month he had dropped the infant on his head while bathing him, and had squeezed and shaken him in June

(demonstrating an alarming degree of force to the detective on a doll that was in the interview room). He denied that petitioner had ever abused the baby.

At one point, petitioner and Scott were left together in a room where they were under surveillance. They conversed in hushed voices, and the words were indiscernible in the original recording. Detectives had one of their video production specialists enhance the audio. Scott began by saying, "Forever going to jail," and then "I wanted to talk to you. To tell you I am sorry [¶] . . . [¶] [f]or abusing him. For choking him." He then said, "It's something awful. We did it but I'm a liar." He asked her, "You think this is all for me, brah?" She answered, "I'm going to get it. Do you hear me? Look me in the eye. Because if they let me go . . . I swear on this family, you will be taken care of. Okay?" He responded, "I just need you to bail me out. I'll just go on the run." Petitioner said that she had been told she would be released from jail on her own recognizance in a few days and would scrounge up the money for his bail. She asked, "what did they say when you took the blame?"; he told her that he would be heading to trial. When petitioner wondered whether she would be going to jail, Scott said, "I don't know. I told him that you didn't have nothing to do with it. I told him that you wasn't even around when it happened." When he said this, petitioner looked visibly relieved on the video and grabbed his hands. When a detective questioned petitioner after removing Scott from the room, she said that Scott did not respond when she asked him why he abused their child.

A search of the apartment from which defendants had called 911 did not find any signs of regurgitation. A recovered suction device also did not have any signs it had been used to extract regurgitation.

Petitioner had an older daughter born in 2010. In July 2011, the maternal grandmother retrieved the daughter from petitioner's home, where she had been left in the custody of a man not known to the grandmother. The child had scratches around her neck, bruising on her body, and diaper rash so severe it required medical attention. From her own child-rearing experience, these injuries did not look ordinary to the grandmother. Petitioner told the grandmother that she was not aware of the injuries. The grandmother filed a report with child protective services, who returned the child to petitioner after a week. The following month, the grandmother learned that

5

the child had incurred a broken leg, and wondered how a child that was not yet walking could sustain such an injury. This time, child protective services removed the daughter from petitioner's custody on the grandmother's report. X-rays determined that the leg was broken in two places. The child was never returned to petitioner's custody; after the termination of parental rights, her sister adopted the daughter and obtained a restraining order against petitioner. Petitioner had told the grandmother that the child had jumped off the bed onto the floor, a story that the grandmother did not believe because the child was able to pull herself upright on the headboard but had never bounced on the bed in her grandmother's presence. The grandmother also testified that petitioner was a habitual liar like her father.

The physician's assistant who treated petitioner's daughter testified that the break was in a spiral pattern resulting generally from twisting force and not compression from a jumping injury. He conceded this twisting could have resulted if the child had planted her foot on landing and her body then turned.

While Smith and Scott were staying briefly with Scott's mother, the mother heard the baby cry out as if in extreme pain. When the mother rushed to the room, the door was closed. She was able briefly to open the door before petitioner closed it again, holding the baby in her arms. The baby cried often in petitioner's care when Scott was out of the house, and when Scott first brought the infant over, the mother thought there was something not quite right, asking her son "You can't see something is wrong with him?" and insisting that they go to Methodist Hospital, where a nurse agreed that the baby looked "a little bit out of it." The couple left after the mother told petitioner that she wanted a paternity test. When his mother visited him in jail, Scott said he had not done anything and was taking the rap.

    2. <u>Defense Case</u>

Scott testified in his own defense. He denied injuring Tyrese, and said that he had falsely admitted hurting the baby so that petitioner would be freed.

Petitioner did not testify.

Each defendant argued that the evidence did not prove they, as opposed to the other, were responsible for the fatal injuries.

6

B. <u>Outcome</u>

On May 9, 2016, the jury found both defendants guilty on both counts. CT at 10 (Lodged Doc. 1, ECF No. 13-1 at 17).[2]  On July 8, 2016, petitioner was sentenced to 25 years to life on Count Two (assault causing death of a child), and punishment on Count One (second degree murder) was stayed.  CT at 44 (ECF No. 13-1 at 50).

II.   <u>Post-Conviction Proceedings</u>

Petitioner timely appealed.  On April 5, 2018, the California Court of Appeal reversed petitioner's murder conviction on grounds that the jury instruction on second degree murder improperly permitted conviction based on a finding of negligence.  Lodged Doc. 10 (ECF No. 13-10) at 11-12, 14.  The appellate court otherwise affirmed the judgment, leaving the assault conviction intact and finding that the evidence was sufficient to support the verdicts on both counts.  <u>Id.</u> at 2-10, 15, 18.  On remand, the superior court corrected the judgment to reflect a single conviction for assault causing death of a child.  Lodged Doc. 11 (ECF No. 13-11).  The California Supreme Court denied review on July 18, 2018.  Lodged Doc. 13 (ECF No. 13-13).

Petitioner did not seek collateral relief in the state courts.

STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides in relevant part as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The statute applies whenever the state court has denied a federal claim on its merits,

---

[2] "CT" refers to the Clerk's Transcript on Appeal, lodged at ECF Nos. 13-1 and 13-2.

whether or not the state court explained its reasons. Harrington v. Richter, 562 U.S. 86, 99 (2011). State court rejection of a federal claim will be presumed to have been on the merits absent any indication or state-law procedural principles to the contrary. Id. (citing Harris v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis)). "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." Id. at 99-100.

The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal principle or principles" previously articulated by the Supreme Court. Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003). Only Supreme Court precedent may constitute "clearly established Federal law," but courts may look to circuit law "to ascertain whether…the particular point in issue is clearly established by Supreme Court precedent." Marshall v. Rodgers, 569 U.S. 58, 64 (2013).

A state court decision is "contrary to" clearly established federal law if the decision "contradicts the governing law set forth in [the Supreme Court's] cases." Williams v. Taylor, 529 U.S. 362, 405 (2000). A state court decision "unreasonably applies" federal law "if the state court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407-08. It is not enough that the state court was incorrect in the view of the federal habeas court; the state court decision must be objectively unreasonable. Wiggins v. Smith, 539 U.S. 510, 520-21 (2003).

Review under § 2254(d) is limited to the record that was before the state court. Cullen v. Pinholster, 563 U.S. 170, 180-181 (2011). The question at this stage is whether the state court reasonably applied clearly established federal law to the facts before it. Id. at 181-182. In other words, the focus of the § 2254(d) inquiry is "on what a state court knew and did." Id. at 182. Where the state court's adjudication is set forth in a reasoned opinion, §2254(d)(1) review is confined to "the state court's actual reasoning" and "actual analysis." Frantz v. Hazey, 533 F.3d 724, 738 (9th Cir. 2008) (en banc). A different rule applies where the state court rejects claims summarily, without a reasoned opinion. In Richter, supra, the Supreme Court held that when a

8

state court denies a claim on the merits but without a reasoned opinion, the federal habeas court must determine what arguments or theories may have supported the state court's decision, and subject those arguments or theories to § 2254(d) scrutiny. Richter, 562 U.S. at 102.

## DISCUSSION

### I. Claim One: Insufficient Evidence to Support Second Degree Murder Conviction

Petitioner presents here the same sufficiency of the evidence challenge that she raised as to the murder charge on direct appeal. See ECF No. 6 (amended petition) at 4. Because petitioner's murder conviction was reversed on other grounds by the California Court of Appeal, Lodged Doc. 10 (ECF No. 13-10), there is no conviction to challenge and no relief that can be granted.[3] Without an extant injury that can be addressed by a favorable judicial decision, this claim is accordingly moot and should be denied as such. See Spencer v. Kemna, 523 U.S. 1, 7 (1998) (failure to satisfy Article III's case-or-controversy requirement renders a habeas petition moot).

### II. Claim Two: Insufficient Evidence to Support Assault Conviction

#### A. Petitioner's Allegations and Pertinent State Court Record

Petitioner contends that there was insufficient evidence to support her conviction for assault that results in the death of a child (Cal. Pen. Code, § 273ab). ECF No. 6 (amended petition) at 4. She alleges that the failure of proof violates her due process rights.

The evidence presented at trial, and reviewed by the California Court of Appeal, has been summarized above.

#### B. The Clearly Established Federal Law

Due process requires that each essential element of a criminal offense be proven beyond a reasonable doubt. In re Winship, 397 U.S. 358, 364 (1970). In reviewing the sufficiency of evidence to support a conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential

---

[3] Petitioner alleges that "the court has not sent a new AOJ," ECF No. 6 at 4, but the record lodged by respondent demonstrates that an amended abstract of judgment was filed in the superior court on September 13, 2018. ECF No. 13-11.

elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). If the evidence supports conflicting inferences, the reviewing court must presume "that the trier of fact resolved any such conflicts in favor of the prosecution," and the court must "defer to that resolution." Id. at 326. "A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." Cavazos v. Smith, 565 U.S. 1, 2 (2011) (per curiam).

### C. The State Court's Ruling

The court must first determine which state-court decision serves as the basis for review. Under AEDPA, when more than one state court has adjudicated the applicant's claim, the federal court looks to the last "reasoned" decision. Barker v. Fleming, 423 F.3d 1085, 1091 (9th Cir. 2005). Thus, a state supreme court's summary denial of discretionary review, which generally does not state a reason for that denial, is not a "reasoned" decision under AEDPA, and we must "look through" that unexplained decision to the last state court to have provided a "reasoned" decision. Ylst v. Nunnemaker, 501 U.S. 797, 806 (1991).

This claim was raised on direct appeal. Because the California Supreme Court denied discretionary review, the opinion of the California Court of Appeal constitutes the last reasoned decision on the merits and is the subject of habeas review in this court. See Ortiz v. Yates, 704 F.3d 1026, 1034 (9th Cir. 2012).

The Court of Appeal ruled as follows:

> In his argument to the jury, the prosecutor contended that it was irrelevant which defendant had committed the abuse, and the jury did not need to agree on the theory of liability; even if not the person who directly inflicted the injuries, the other would be vicariously liable at least under the failure to comply with the duty of a parent to put a stop to abuse that must have been apparent (*People v. Rolon* (2008) 160 Cal.App.4th 1206, 1209 (*Rolon*)), or in helping to cover up the actions of the other after the infliction of the abuse. Even if one of them were only complicit in simple child abuse, an assault resulting in death would be the natural and probable consequence of the target crime.
>
> Defendant Smith argues that only defendant Scott admitted abusing the baby, and there is otherwise an absence of any evidence that she is directly liable for any abuse. She also contends there is an absence of any direct evidence that she was aware of any abuse and failed to act, or that she intentionally encouraged or assisted in an assault

> resulting in death (or simple abuse reasonably resulting in the same).
>
> What defendant Smith disregards is the circumstantial evidence of her direct or complicit participation in murder or assault of a child resulting in death, direct evidence so rarely being available in these heinous offenses. There is the absolute lack of credence to her ever-shifting attempts to explain the death as a consequence of a regurgitation that the physical and medical evidence did not support, and her suggestion that this phantom ailment might be the result of CPR that would be in response to it. The medical experts opined that there would be neurological deficits from ongoing abuse that should have been apparent to any reasonable caregiver, and were in fact apparent to defendant Scott's mother and the Methodist Hospital nurse when defendant Scott brought the baby in for treatment. Although we are wary of ordinarily inferring that a person's failure to comply with a purported template of grief unerringly points to a consciousness of guilt, there is also defendant Smith's lack of reaction to the death of her baby, which was so outside common experience that everyone who encountered her was struck by it. Further, the jury heard defendant Smith's own mother testify that she was a habitual liar. In addition, the recorded conversation with defendant Scott was at least an adoptive admission that she agreed defendant Scott was not being truthful in accepting full blame for the death, for which she would make sure that he would be "taken care of." Finally, there is the evidence of abuse of her daughter which, if the jury found by a preponderance of the evidence that she committed, could be the basis for an inference that she committed abuse against her son as well. This overwhelming manifestation of a consciousness of guilt is more than sufficient for a jury rationally to conclude that she either committed or was complicit in the abuse (whether actively or as a matter of a knowing failure to act on her duty as a parent). We therefore reject the claim.

Lodged Doc. 10 (ECF No. 13-10) at 8-10.

### D. Objective Reasonableness Under § 2254(d)

Although the state court did not cite Jackson v. Virginia or explicitly apply the standard it prescribes, this court may not grant relief unless the state court's analysis was objectively unreasonable under Jackson. See Early v. Packer, 537 U.S. 3, 8 (2002) (even if state court fails to cite or indicate awareness of federal law, its decision must be upheld "so long as neither the reasoning nor the result of the state-court decision contradicts" clearly established United States Supreme Court authority).

Cal. Pen. Code, § 273ab requires proof that that a person with the care or custody of a child under eight years old used force on the child that to a reasonable person would be likely to produce great bodily injury (not necessarily death), which resulted in the child's death even if that

was not the intent. People v. Albritton, 67 Cal.App.4th 647, 655 (1998). It is not a "murder" statute but a "homicide" statute, because it does not require the presence of malice, regardless of the fact that it carries the same penalty as murder. Id. at 656. As noted by the Court of Appeal, California principles of vicarious liability permit conviction of a defendant who did not personally perform the act(s) of force likely to produce great bodily injury where the defendant failed to comply with the duty of a parent to put a stop to abuse that must have been apparent. See People v. Rolon, 160 Cal.App.4th 1206, 1209 (2008). This court is bound to accept and apply these principles of substantive state criminal law. See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (federal habeas court is bound by a state court's interpretation of state law).

Under Jackson, the state appellate court was obliged to view the evidence in the light most favorable to the judgment and to consider all reasonable inferences in support of that judgment. It did so. Although petitioner is correct that there was no direct evidence that she personally committed the fatal acts of child abuse, criminal liability under Penal Code § 273ab does not require such proof. The state court's findings regarding the circumstantial evidence, and the inferences of culpability reasonably supported by that evidence, are not objectively unreasonable. To the contrary, it cannot be said that *no* rational trier of fact could have agreed with the jury. See Cavazos, 565 U.S. at 2.[4] Particularly in light of the "double dose of deference" to the verdict that is required under Jackson and the AEDPA, Boyer v. Belleque, 659 F.3d 957, 964 (9th Cir. 2011), federal habeas relief is unavailable.

III.   Claim Three: Admission of Prior Child Abuse Evidence

A.   Petitioner's Allegations and Pertinent State Court Record

Petitioner contends that her rights to due process and a fair trial were violated by admission of evidence that she had previously abused her daughter. Petitioner alleges that "[t]he evidence of prior bad act was admitted as evidence of prior violent act on a child, despite CPS finding no such conclusion." ECF No. 6 at 5.

---

[4] Cavazos is particularly instructive as it was a Penal Code § 273ab case in which the evidence against the petitioner, a doting grandmother, was weaker than that against petitioner here. The Supreme Court's reversal of the Ninth Circuit's grant of habeas relief in Cavazos effectively forecloses petitioner's claim.

B. <u>The Clearly Established Federal Law</u>

The admission of evidence is governed by state law, and habeas relief does not lie for errors of state law. <u>Estelle v. McGuire</u>, 502 U.S. 62, 67 (1991). The erroneous admission of evidence violates due process, and thus supports federal habeas relief, only when it results in the denial of a fundamentally fair trial. <u>Id.</u> at 72. The Supreme Court has rejected the argument that due process necessarily requires the exclusion of prejudicial or unreliable evidence. <u>See</u> <u>Spencer v. Texas</u>, 385 U.S. 554, 563-64 (1967) (state procedure for enforcing recidivist statutes that included presenting evidence of past convictions did not violate due process even if there was "possibility of some collateral prejudice"); <u>Perry v. New Hampshire</u>, 565 U.S. 228, 245 (2012) ("[T]he potential unreliability of a type of evidence does not alone render its introduction at the defendant's trial fundamentally unfair." (citations omitted)).

C. <u>The State Court's Ruling</u>

This claim was exhausted on direct appeal, and the last reasoned state court decision is the opinion of the Court of Appeals. That opinion is therefore the subject of review under § 2254(d). <u>Ortiz</u>, 704 F.3d at 1034.

The state appellate court ruled in pertinent part as follows:

> Before trial, the parties litigated the admissibility of the injuries to defendant Smith's daughter in 2011 pursuant to Evidence Code section 1109 (which, subject to section 352 of that code, permits the introduction of propensity evidence involving domestic violence or child abuse). The statute incorporates the definition of "domestic violence" (Evid. Code, § 1109, subd. (a)) appearing in Family Code section 6211 (which includes abuse against a party's child).
>
> Defendant Smith's main objection to admission was the absence of direct evidence that she was the agent of the injuries, as opposed to being simply neglectful about the abuse by others. Defense counsel argued the evidence was more prejudicial than probative as a result. The trial court concluded that the present case "is the ultimate form of domestic violence" and the prior acts of child abuse were also domestic violence for purposes of the exception to the exclusion of propensity evidence. In terms of prejudice, the prior conduct was not more shocking than the death of the present victim, the conduct was recent, the jury was not likely to be confused about the past and present acts, and the jury was unlikely to want to punish her for the prior acts because they resulted in the termination of defendant Smith's parental rights. The court accordingly found the evidence admissible.

13

> Defendant Smith essentially rehashes her arguments in the trial court. She contends as a matter of law the prior incidents cannot constitute domestic violence because child protective services charged her only with neglect rather than abuse after the July referral and returned the child to her custody, and a doctor had apparently opined at the time of the August incident that it was conceivable the broken leg could have occurred if the child jumped off a bed (rather than being an inflicted injury like the rest). [Footnote omitted.] She also contends the trial court abused its discretion in not finding the evidence unduly prejudicial.
>
> Defendant Smith does not provide any authority for her position that evidence of prior domestic violence must demonstrate on its face that a defendant is the agent of the abuse in order to be admissible, as opposed to allowing a jury to determine whether the abuse can be attributed to the defendant. Even when a victim is available to testify that the abuse was at the hands of a defendant, a defendant can still contest the credibility of the victim in seeking to convince a jury that it did not happen. As for the resolution of whether the evidence should nonetheless be excluded as being unduly prejudicial, we do not find the trial court's reasoning to be an abuse of discretion. We therefore reject the argument.

Lodged Doc. 10 (EF No. 13-10) at 15-16.

### D. Objective Unreasonableness Under § 2254(d)

Respondent argues that petitioner's due process claim is unexhausted because her appeal did not present a federal constitutional theory to the state court. ECF No. 12 at 18. The exhaustion of state court remedies is a prerequisite to federal habeas relief, and exhaustion requires presentation of the federal constitutional basis of the claim to the highest state court. See Wooten v. Kirkland, 540 F.3d 1019, 1025 (9th Cir. 2008); cert. denied, 556 U.S. 1285 (2009). However, exhaustion is not jurisdictional. Granberry v. Greer, 481 U.S. 129, 131 (1987). An unexhausted claim may be denied on the merits. 28 U.S.C. § 2254(b)(2). For the reasons that follow, denial on the merits is appropriate here.

The Court of Appeal's resolution of the evidentiary issue was based on California law, and accordingly may not be revisited in this court. See Lewis v. Jeffers, 497 U.S. 764, 780 (1990) (explaining that federal habeas corpus relief does not lie for errors of state law); Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (explaining that a federal habeas court is bound by a state court's interpretation of state law). The only question cognizable here is whether admission of

////

the evidence regarding petitioner's daughter rendered the trial fundamentally unfair. Estelle, 502 U.S. at 72.

The United States Supreme Court has never held that due process is violated by a state law authorizing the use of prior bad acts or other propensity evidence in child abuse cases, nor has it ever held that a defendant's due process rights have been violated in an individual case by admission of such evidence. See Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) (recognizing that the Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ"); see also Alberni v. McDaniel, 458 F.3d 860, 863-64 (9th Cir. 2006). Absent a holding of the U.S. Supreme Court that governs the question, petitioner cannot qualify for the narrow exception to the AEDPA's bar to relief. Wright v. Van Patten, 552 U.S. 120, 125-26 (2008) (per curiam); see also Holley, 568 F.3d at 1101 ("Under AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme Court." (quoting 28 U.S.C. § 2254(d))). For this reason, federal habeas relief is unavailable.

CONCLUSION

For all the reasons explained above, the state courts' denial of petitioner's claims was not objectively unreasonable within the meaning of 28 U.S.C. § 2254(d) and petitioner is not entitled to relief on any of her claims. Accordingly, IT IS HEREBY RECOMMENDED that the petition for writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. §636(b)(l). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues. See 28 U.S.C. § 2253(c)(2). Any reply to the objections shall be served and filed within fourteen days after service of the objections. The parties are advised that failure to file

objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: June 2, 2023

/s/ Allison Claire
ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE